IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COPLEY FUND, INC.<br>5348 Vegas Drive, Suite 391<br>Las Vegas, NV 89108,<br><br>          Plaintiff,<br><br>    v.<br><br>UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION,<br>100 F Street, N.E.<br>Washington, D.C. 20549,<br><br>          Defendant. | CASE NO.: |

## COMPLAINT

Plaintiff Copley Fund, Inc. ("Copley Fund" or the "Fund") files this Complaint against the United States Securities and Exchange Commission ("SEC" or the "Commission"), and alleges as follows:

## INTRODUCTION

1.      This is a lawsuit arising under the Administrative Procedure Act, 5 U.S.C. §§ 500, *et seq.* ("APA"), challenging the Commission's effective denial of Copley Fund's most recent application for exemptive relief under Section 36 of the Securities Exchange Act, 15 U.S.C. § 78mm, from Rule 22c-1, promulgated under the Investment Company Act of 1940 (the "ICA"), and Rule 4-01(a)(1) of Regulation S-X (the "Application"), as well as the Commission's arbitrary and capricious treatment of Copley Fund's numerous requests for relief.

2.      Copley Fund is an open-ended, SEC-registered mutual fund that has been in business since 1978.  Copley Fund is unique because it accumulates dividends and capital gains,

rather than distributing them to shareholders.  Any taxable income realized by the Fund is subject to taxation at the corporate level and is not passed on to the individual shareholders, as would be the case if the Fund were organized as a regulated investment company ("RIC").  If the value of the Fund's investments increase because of the net accumulated dividends and/or increases in the value of its portfolio, then the value of shares in the Fund increase.  Shareholders are able to defer taxes until they actually sell their shares, at which time shareholders will incur a loss or realize a gain, depending on the Fund's per-share value at the time of redemption.  To achieve this result, Copley Fund is organized as a "C" Corporation for federal income tax purposes, rather than as a RIC.

3.      Until 2007, Copley Fund accrued a deferred tax liability on unrealized gains from its investment portfolio (i.e., increases in value of the Fund's stock purchases over their purchase prices) pursuant to a reserve formula established by the Fund's Board of Directors, which formula was based on the Fund's investment strategy and historic performance.  This reserve was always in excess of the Fund's actual tax liability and, for decades, was not challenged by the SEC.

4.      In 2007, the Commission's Division of Investment Management (the "DIM") demanded that Copley Fund abandon its proven and established method of accruing for deferred taxes in favor of the full liquidation method, which the DIM asserted was required, without exception, under Generally Accepted Accounting Principles ("GAAP") for C Corporations generally.   Under threat of enforcement action against both Copley Fund and the principal of its investment advisor, Copley Fund complied with the Commission's requirements.

5.      As a result, Copley Fund's shareholders have suffered significant harm because the full liquidation method produces an artificially depressed valuation of the Fund's net asset

value ("NAV"), thus depriving redeeming shareholders of the fair value for their shares and misleading current and future investors in the Fund.  Under the full liquidation method, Copley Fund must present its NAV, and, thus, its share price, as if the Fund had simultaneously sold all of its investments and paid taxes on all investment gains, a hypothetical and wholly unrealistic situation that has never occurred in Copley Fund's decades-long history and that would be entirely contrary to the Fund's investment strategy.  The full liquidation method also makes it appear that Copley Fund has fewer assets and an overall lower value.  The resulting calculations of operating expense ratios and percentage return on investment, both of which are important to measure the Fund's performance, are also materially misleading to investors.  By requiring that Copley Fund employ the full liquidation value method of accounting for deferred tax liability, the Commission, which is charged in part with protecting investors, is actually forcing Copley Fund to mislead investors.

6.     Since 2008, Copley Fund has presented multiple legitimate arguments to the Commission and its Staff in support of its position that the Fund and its investors are in fact harmed by the Commission's insistence on rote application of accounting rules applicable to C Corporations generally, and that the Fund's proposed alternative methodologies would result in a more reasonable, accurate and equitable result for both Copley Fund and its investors. Despite a steady stream of letters outlining requests for no-action relief and other applications for review that were exchanged between Copley Fund and the DIM over the years, including the DIM's interception of a letter from Copley Fund directed to the Commissioners seeking their intervention in this matter, Copley Fund has never received a written, substantive response to the Fund's multiple arguments and proposals or a final, written order denying the requested relief.

7.     Because Copley Fund was forestalled from receiving a reasoned, final disposition of its requests from the Commission, it was frozen in administrative limbo for years, forced to mislead investors and suffer economic harm because of the Commission's demands, but unable to obtain due process, let alone any remedy, through administrative channels.  Copley Fund's Application was made as a last resort to obtain review from the Commission of the Fund's detailed arguments in support of relieving it from compliance with these rules of general application.

8.     Under Section 36 of the Exchange Act, the Commission "may conditionally or unconditionally exempt" Copley Fund from the above-referenced rules "to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." 15 U.S.C. § 78 mm.  Copley Fund included in its Application proposals for a reserve for deferred tax liability based on Copley Fund's historic investment strategy and performance, as well as full disclosure comparing this method to the full liquidation value method.

9.     Copley Fund's proposals met the Section 36 standard for granting an exemption for the following reasons:

     a.    Copley Fund's proposed formulas for calculating the reserve protects current and future investors by accurately presenting the Fund's NAV, as compared to the full liquidation value method, which understates the amount of invested assets under management on which gains or losses are actually realized and overstates the Fund's operating expense ratio;

     b.    The Fund's unique structure and operations among open-ended mutual funds make the full liquidation value method particularly misleading to current and future investors by artificially depressing the value of the Fund and its NAV, especially when the risk of the Fund incurring a tax liability in excess of the proposed pre-set reserve is exceedingly remote (and has never even remotely come close to occurring in the Fund's history of using a similar reserve methodology from 1992 to 2007);

     c.     Copley Fund has offered to make full disclosures of the Fund's NAV under both methodologies, and has established a mechanism for conversion to a RIC in the unlikely event unforeseen circumstances were to cause gains to be realized that consumed the entire amount of deferred income tax reserves it has accumulated;

     d.     Either of the proposed reserve methodologies is consistent with the fundamental GAAP principles of revenue/realization recognition and matching, adequate disclosure, and that businesses will continue as going concerns.  In contrast, as applied to Copley Fund's unique circumstances, the full liquidation value method: (a) misleads investors by failing to convey accurately the true value of the Fund's shares, (b) assumes that the Fund will totally liquidate, and (c) transforms a contingent, deferred liability into a full, current, realized liability while also failing to match current revenues and assets with accurate, actual liabilities; and

     e.     Exemption is warranted because the proposed reserve methodologies (and associated measures designed to inform and protect investors) comport with the Commission's history of permitting certain flexibility in interpreting and applying generally accepted accounting principles or other tax accounting provisions when doing so would lead to more accurate reporting.

10.     Copley Fund's Application, like its prior efforts to obtain review by the full Commissioners, proved futile, as the Commission has failed to issue any substantive response despite Copley Fund's repeated submissions requiring that the Commission issue an informative response to its presentations.  There is nothing more that Copley Fund could have done – or was legally required to do – to secure a substantive response or final order from the SEC.

11.     The Commission's effective denial of Copley Fund's Application and complete failure to respond on the merits to any of the Fund's arguments in favor of reverting to its original method of accounting for deferred tax liability, which it used for 20 years without any investigatory inquiry, is arbitrary, capricious, an abuse of discretion, and in violation of the Administrative Procedure Act.  Copley Fund seeks *de novo* review by this Court of its Application and a declaration that its proposed methodologies for accounting for deferred tax

liability on unrealized gains and accompanying disclosures are in the public interest, consistent with the federal securities laws and provide the requisite protection of investors.

PARTIES

12.     Plaintiff Copley Fund is a Nevada corporation and is registered under the ICA as a diversified, open-ended management investment company.

13.     Defendant SEC is an agency of the United States government subject to the APA. *See* 5 U.S.C. § 551(1).

JURISDICTION AND VENUE

14.     This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*  As set forth below, *see* paragraphs 16 through 126 *infra*, Copley Fund has exhausted all available avenues for obtaining due process and appropriate relief from the SEC and, therefore, this matter is ripe for judicial review under 5 U.S.C. § 704.  Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against a federal agency of the United States that resides in this judicial district and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

BACKGROUND FACTS AND PROCEDURAL HISTORY

I.     OVERVIEW OF COPLEY FUND'S BUSINESS AND INVESTMENT STRATEGY

16.     Copley Fund is an open-ended, management investment company under the ICA.

17.     Copley Fund was organized in 1978 and has operated continuously since that time.

18.     Copley Fund's stated investment objective is "the generation and accumulation of dividend income."  Its secondary objective is "long-term capital appreciation."

19.     Copley Fund has not elected to be a RIC under the Internal Revenue Code.[1] Rather, it is organized as a "C" Corporation for federal income tax purposes.  Accordingly, any taxable income generated by the Fund is subject to taxation at the corporate level and is not passed on to the individual shareholders, as would be the case if the Fund had elected RIC status.

20.     Key to the Fund's investment objective is its strategy, contrary to most other funds, of not distributing dividends and capital gains to shareholders, but rather, accumulating them within the Fund and then adding them to the value of each share on a daily basis.  Thus, shareholders are able to defer taxes on dividend and capital gains until redemption, at which time shareholders will incur a loss or realize a gain depending upon the Fund's per share value at the time of redemption.  This not only defers taxes until the shareholders, each making an independent decision, elect to redeem Copley Fund shares, but also permits the accumulated dividends and capital gains to remain invested under Copley Fund's investment strategies.

21.     Critical to the Fund's investment policy is that the retention of dividends leaves more money "at work" in the Fund.  Thus, the true measure of the Fund's performance is to calculate income and gain as a function of the total deployed capital.  Forcing Copley Fund to reduce misleadingly its reported net assets by requiring an inappropriately high tax reserve distorts the Fund's performance and misleads investors because it significantly understates the Fund's total deployed capital.[2]

---

[1] RICs may escape full corporate taxation because, unlike ordinary corporations, they are entitled to claim a deduction for dividend payments against ordinary income and net capital gains.  A corporation qualifies as a RIC if it makes an irrevocable election to be a RIC by filing a tax return on Form 1120-RIC and it meets certain requirements specified in IRC Sections 851 and 852.  In order to qualify for this election, Copley Fund would be required, among other things, to distribute to shareholders its undistributed earnings and profits, effectively destroying the very basis upon which Copley Fund operates.

[2] This distortion is manifest in good years as well as bad, as graphically demonstrated at paragraph 85 below.

22.     Insofar as the Fund itself is concerned, up to 70% of the dividend income received, or 70% of the taxable income of the Fund, whichever is less, is exempt from federal taxation under the Internal Revenue Code.  The remaining 30% of the Fund's income is taxable.

23.     Upon information and belief, Copley Fund is the only U.S. open-ended mutual fund that operates in this manner.  The SEC has acknowledged that Copley Fund is uniquely structured as compared to other U.S. open-ended mutual funds.[3]

24.     Copley Fund's portfolio securities are all highly liquid and are marked to the market daily.  Any increase or decrease in value is reflected in the Fund's per share price, which is publicly available after the close of business every day on which The New York Stock Exchange is open.

25.     For almost 30 years, Copley Fund's accounting methodology and publicly filed financial statements remained unquestioned by the SEC.  Indeed, the Public Company Accounting Oversight Board examined the Fund's financials and reported thereon for the period ended February 28, 2006 – the period immediately preceding the DIM's intervention – and issued an affirming clean report.

II.     THE SEC DEMANDS COPLEY FUND ACCOUNT FOR NAV USING THE FULL
        LIQUIDATION VALUE METHOD

26.     In a comment letter, dated September 26, 2007, the DIM alleged for the first time that Copley Fund had failed to account properly for deferred tax liabilities, as allegedly required by FAS 109 and in violation of Rule 4-01(a)(1) of Regulation S-X, which provides that "financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate,

---

[3] *See* paragraph 43 *infra*, Exhibit H.

despite footnote of other disclosures, unless the Commission has otherwise provided."

*See* **Exhibit A** (attached).

27.     It is not clear from the DIM's correspondence what caused it to alter its view in 2007 and to require Copley Fund to change its methodology.  Indeed, to this very day, the SEC has never provided any explanation for this demand that Copley Fund radically revise the method it used for the preceding 20 years, without comment by the SEC, to establish its tax reserve.

28.     By letter, dated November 30, 2007, the Boston Regional Office of the SEC Division of Enforcement expressed to Copley Fund its intent to seek immediate injunctive relief against the Fund if it did not adjust its per share NAV to account for the full liquidation liability for tax on unrealized capital gains.  *See* **Exhibit B** (attached).

29.     To avoid such litigation, Copley Fund's Board approved shortly thereafter an adjustment of the Fund's NAV succumbing to the SEC's preferred, full liquidation value methodology.

30.     On March 21, 2008, the Division of Enforcement informed Copley Fund that it was conducting an informal investigation of the Fund into possible violations of the securities laws based on the tax reserve calculations that had been used without objection for the preceding 20 years.  The Division of Enforcement further requested that Copley Fund provide certain information on a voluntary basis.

31.     Upon information and belief, the SEC apparently later converted the proceeding into a formal investigation against Copley Fund and its CEO Irving Levine for potential violations of certain antifraud provisions, namely, Section 34(b) of the ICA, Rule 22c-1(a), promulgated under Section 22(c) thereunder, Section 17(a) of the Securities Act of 1933 (the

"Securities Act"), and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; as well as a books and records violation under Section 204 of the Investment Advisors Act of 1940 and Rule 204-2 promulgated thereunder.

32.     Copley Fund and Mr. Levine fully cooperated with the investigation and no further enforcement or administrative action was taken against them.

33.     As a result of the SEC's demands, Copley Fund restated its earnings for 2007 on July 18, 2008, to account for the full liquidation value methodology as mandated by the SEC and filed an amended Form N-CSR/A containing a Restated Annual Report to its shareholders.  *See* **Exhibit C** (attached).

34.     The SEC's demand for full liquidation value accounting of the Fund's NAV caused the shareholders of Copley Fund immediate harm, as the Fund's per share value declined by $13.89 as a result of increasing the deferred tax liability to a level that would be realized only if the entire appreciated portfolio were liquidated immediately – a wholly unrealistic and unreasonable assumption given Copley Fund's 30-year investment history and strategy. *See* **Ex. C** at 3.

III.     COPLEY FUND'S PURSUIT OF RELIEF FROM THE SEC AND THE SEC'S FAILURE TO PROVIDE A REASONED RESPONSE TO COPLEY'S ARGUMENTS

35.     Since as early as 2008, Copley Fund has presented multiple arguments to the SEC in support of its position that the Fund, its investors, and the public generally, would be better served by allowing Copley Fund to account for its NAV pursuant to its prior reserve methodology, as opposed to the inappropriate, ill-fitting, and misleading full liquidation value method prescribed by GAAP rules for C Corporations generally.  Even now, after pursuing all

available avenues for relief from the SEC, Copley Fund has yet to receive any written, substantive response to its multiple arguments and proposals.

36.     Immediately following the SEC's launch of an investigation into Copley Fund's accounting practices, Copley Fund sent a letter, dated November 19, 2008, to James S. Goldman, Esq., of the SEC's Boston Regional Office, enclosing a memorandum that described in detail the negative impact of the change in methodology and the reasons Copley Fund's original reserve methodology was in the best interests of the shareholders (the "November 2008 Memo").  *See* **Exhibit D** (attached).

37.     Among other things, the November 2008 Memo explained that Copley Fund's change to the full liquidation value method resulted in misleading and inconsistent financial statements that did not reflect the fair or accurate value of the Fund's shares.  The letter also enclosed a proposed Prospectus Supplement that would provide disclosures to the shareholders necessary for their consideration of the risks associated with this methodology.

38.     Copley Fund never received a substantive response to the November 2008 Memo. Instead, in February of 2009, Mr. Goldman informed Copley Fund that the investigation of the Fund had been reassigned to Lawrence Pisto, Esq., also of the Boston Regional Office.

39.     Copley Fund waited another eight months but did not receive a response from Mr. Pisto.  By letter, dated October 5, 2009, Copley Fund inquired about the status of the investigation.  With that letter, Copley Fund re-submitted the November 2008 Memo and proposed Prospectus Supplement.  *See* **Exhibit E** (attached).  As detailed therein, Copley Fund argued that a certain degree of flexibility is appropriate and warranted under GAAP and the SEC rules, and that such flexibility was particularly necessary here.  Further, the Fund reiterated its

willingness to provide full transparent disclosures to its investors and requested a meeting with the DIM.

40.     The requested meeting never took place.  Instead, in a December 2, 2009 letter, the DIM asserted that Copley Fund had not provided any new arguments for the DIM's consideration; nor had there been, according to the DIM, any "changes in the Company's circumstances that might cause reconsideration of [the DIM's] original position."  *See* **Exhibit F** (attached).  In sum, the DIM reverted to its original position, essentially, that "GAAP is GAAP," without offering any reasoned analysis of Copley Fund's arguments that simple, mechanical application of general accounting rules is inappropriate and harms Copley Fund and the public investors.

41.     In the same letter, the DIM further informed Copley Fund that it would again recommend immediate enforcement action if Copley Fund were to submit financial statements that did not comply with the "one size fits all," full liquidation methodology for accounting NAV demanded by the SEC.  *See* **Ex. F**.

42.     On March 5, 2010, Kevin Kelcourse, Esq., Assistant Regional Director of the SEC's Boston Regional Office, informed Copley Fund that the SEC's investigation of the Fund and Mr. Levine was officially completed and that the Division of Enforcement would not recommend enforcement action.  Thus, the investigation closed without any adverse consequences or the imposition of fines and/or penalties.  Nonetheless, Mr. Kelcourse's letter reiterated that if Copley Fund did not comply with the full liquidation methodology of accounting NAV demanded by the SEC, the Division of Enforcement would recommend enforcement action by the Commission.  *See* **Exhibit G** (attached).

43. Following the closing of the investigation, Copley Fund and its counsel engaged in further communications with the DIM in an effort to reach a mutually acceptable resolution of this issue. For example, on July 15, 2010, Copley Fund's counsel exchanged e-mails with Kevin Rupert of the DIM's Staff concerning proposed modifications to Copley Fund's financial statements. In that exchange, *Mr. Rupert acknowledged the unique structure of the Fund*, stating that, "While we have been firm on not permitting footnotes, *this fund has really unusual tax issues*, and for this reason an explanatory footnote *might* be permitted – but I make no promises." *See* **Exhibit H** (attached) (emphasis added).

44. In yet another effort to engage the SEC on the substance of its arguments against the prescribed full liquidation value method of accounting for NAV, on September 28, 2011, Copley Fund sent a letter requesting no-action relief from the DIM. *See* **Exhibit J** (attached). This request set forth in detail that the use of the DIM's full liquidation value methodology is inappropriate given the unique nature of the Fund, is inconsistent with its investment philosophy, policy and practice, and has led to misleading financial statements and reporting that understate the amount of assets under management and do not represent the true value of the Fund's shares. *See* **Ex. J**.

45. Copley Fund explained that the Commission's refusal since 2007 to permit its management to exercise any discretion with respect to deferred tax accounting differed from its treatment of other companies with long-term investment strategies, that the SEC permitted to depart from a literal reading of a required tax accounting provision. *Id.* Indeed, the SEC has permitted Weyerhaeuser, American Tower Corp., and several other companies to depart from a literal reading of the SEC's tax accounting rules and GAAP, which contradicts the SEC's current

position with respect to Copley Fund and demonstrates that its position is unsupportable, arbitrary, and capricious.

46.     When Copley Fund's September 28, 2011 letter failed to produce a written response from the DIM for over six months, Copley Fund wrote again to the DIM on March 28, 2012.  *See* **Exhibit K** (attached).  Here, Copley Fund specifically requested some written opinion from the DIM addressing its request for no-action relief and the various arguments presented to the SEC by Copley Fund since as early as November of 2008 in support of the SEC permitting the Fund to alter the manner in which it accounts for deferred tax liability for unrealized gains. *Id*.

47.     Copley Fund further detailed: (a) its past efforts to address the SEC's concerns; (b) arguments explaining why rote application of Rule 4-01(a)(1) of Regulation S-X yields inaccurate and misleading information to investors concerning the Fund's NAV; (c) relevant precedents showing the SEC's deviation from strict application of the rules in similar circumstances; and (d) Copley Fund's proposals for a structured reserve formula and conversion to a RIC should unforeseen circumstances so require.  *Id.*

48.     The DIM did not respond to Copley Fund *for over a year*.  By letter, dated April 5, 2013, the DIM summarily denied Copley Fund's request for no-action relief.  *See* **Exhibit L** (attached).  The DIM did not respond to any of Copley Fund's arguments addressing why application of Rule 4-01(a)(1) of Regulation S-X is inappropriate, misleading, and harmful in this case.  Instead, the DIM merely recited again the verbatim rules and general GAAP provisions, and informed the Fund that its proposals "would not comply with GAAP as it would result in Copley recognizing only a portion of the deferred tax liability required by ASC 740." *Id.*

49.     Having failed to receive a reasoned response to its arguments from the DIM, Copley Fund next sought relief directly from the full panel of Commissioners in a letter, dated April 12, 2013, in which Copley requested a full *de novo* review by the Commissioners of the DIM's April 5, 2013 denial of Copley's request for no-action relief and the issuance of a final written order.  *See* **Exhibit M** (attached).  Copley Fund summarized therein for the Commissioners' benefit its arguments in support of its proposed reserve methodology, specifically, that it was more consistent with the assumptions, constraints and conventions underlying GAAP than the full liquidation value methodology, and that GAAP expressly allowed for flexibility when strict adherence to the principles of general application would be unreasonable.  *Id.* at 2-4.

50.     This letter, however, never reached the Commissioners.  The DIM intercepted Copley Fund's letter to the Commissioners and, on its own accord, chose to "interpret[] [Copley's] request as being made pursuant to [Rule 202.1(d)].  Under Rule 202.1(d), which the Division may present a request for Commission review of a Division no-action response if it concludes that the request involves a matter 'of substantial importance and where the issues are novel or highly complex.'"  *See* **Exhibit N** (attached).  *Even though a DIM representative had previously acknowledged Copley's unique structure and unusual tax issues*, *see* **Ex. H**, the DIM unilaterally decided to withhold Copley's request from consideration by the full panel of Commissioners.  *See* **Ex. N.**

51.     Copley Fund responded to the DIM's inappropriate intervention in a letter, dated July 15, 2013, and respectfully requested that the DIM step aside and permit the Fund the due process of a full and final *de novo* review and determination of this matter by the full panel of Commissioners and the issuance of a final, written order.  *See* **Exhibit O** (attached).

52.     The DIM again denied Copley's request for Commission review of its prior no-action requests in a letter, dated August 2, 2013.  *See* **Exhibit P** (attached).  The DIM further declared that the Fund had no recourse to a full review by the full panel of Commissioners.  *Id.* The DIM volunteered, however, that, "[t]o the extent [Copley Fund] seek[s] Commission consideration of [its] request," the Fund could submit a request for exemptive relief pursuant to Section 36 of the Exchange Act.  *Id.*  Pursuant to Section 36, the Commission "may conditionally or unconditionally exempt" Copley Fund from Rule 4-01(a)(1) of Regulation S-X "to the extent that such exemption is necessary or appropriate in the public interest, and consistent with the protection of investors."  15 U.S.C. § 78mm.  The DIM added, however, that it "would not support such relief" and warned that it could "give no assurances that the Commission will entertain the request."  *Id.*

53.     In a final effort to obtain review by the full Commission and a final, written order, Copley Fund followed the DIM's suggestion and submitted an application for exemptive relief to the Commission on September 4, 2013  *See* **Exhibit Q** (attached).  In its application, Copley Fund presented the same arguments and supporting facts that Copley has repeatedly been trying to get before the Commission for *five years*, all of which show that the Fund's preferred method of accounting for NAV, which can and should be permitted by the Commission by exercise of its discretion, provides greater benefit, more accuracy and full transparency to investors than the full liquidation value method currently demanded by the SEC.  Copley Fund also described in detail several limitations and conditions it would put in place to advise and protect investors appropriately should the SEC grant its request for exemption.  *See* **Ex. Q**.

54.     Copley Fund's Application for exemptive relief met the Section 36 standard and the Commission should have issued an exemption pursuant to, and subject to the conditions in, Copley Fund's Application.

55.     The SEC failed to respond to Copley Fund.

56.     After four months of delay and inaction on Copley Fund's Application, the Fund sent yet another letter to the Commission on January 24, 2014, reciting again all of its efforts to obtain a reasoned response from the Commission to the arguments Copley Fund has presented over the past several years, and requesting such a response within a reasonable time or at the latest by February 28, 2014.  *See* **Exhibit R** (attached).

57.     Almost two months have passed since Copley Fund last sought administrative action in response to its Application, which, of course, followed numerous similar requests for some reasoned engagement with the Commission made over many years.  Copley Fund has exhausted all available channels for administrative review, due process, and relief from the Commission.  Its efforts have been futile.

58.     Over the past several years, Copley Fund has provided substantive arguments showing that the SEC's insistence on rote application of the rules and regulations for C Corporations generally is inappropriate for the Fund, harmful to its investors, and materially misleading.  Copley Fund has offered well-reasoned alternatives that both protect investors and are consistent with the Fund's investment strategy.  The SEC has not provided any substantive response to these arguments.  Copley Fund has nevertheless fully complied with the demands of the Commission and its Staff to account for its NAV on a fully liquidated basis.  As a result, Copley Fund has suffered harm because of the artificially depressed and misleading valuation of the Fund's NAV under the SEC's prescribed methodology.

## THE SEC'S TREATMENT OF COPLEY FUND HAS BEEN
## ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

59.     The Commission's unreasonable delays in responding to Copley Fund's

numerous requests for relief over many years, and the agency's failure to address the merits of

Copley Fund's arguments in favor of altering its method of accounting for deferred tax liability

when it did respond to Copley Fund's requests, have been arbitrary, capricious, and an abuse of

discretion under the APA.  *See* 5 U.S.C. § 706(2)(A).  Firstly, the SEC's demand in 2007 that

Copley Fund abandon its preferred method of accounting for deferred tax liability, which it used

for almost 30 years without any problem or negative comment from the SEC, in favor of a full

liquidation method, which harms Copley Fund's shareholders and misleads investors, was

arbitrary, capricious, and an abuse of discretion.  Secondly, the SEC's serial, unreasonable delays

in responding to Copley Fund's requests for relief, and the agency's failure to issue a final order

despite several requests from Copley Fund was arbitrary, capricious, and an abuse of discretion.

Thirdly, the SEC has acted arbitrarily and capriciously, and has abused its discretion in failing to

consider or respond to Copley Fund's arguments in favor of allowing it to revert to its prior,

preferred method of accounting for deferred tax liability on unrealized gains.

I.     THE SEC'S SERIAL DELAYS IN RESPONDING TO COPLEY FUND'S
       REQUESTS FOR RELIEF AND REFUSALS TO ISSUE A FINAL ORDER HAVE
       BEEN ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

60.     As alleged in the Background Facts and Procedural History above, the SEC has

consistently delayed responding to Copley Fund's numerous requests for relief over many years.

Moreover, despite several requests for a final, written order so that Copley Fund might pursue

judicial review of the SEC's actions, the SEC has withheld such orders without explanation.  All

the while, Copley Fund's shareholders have continued to suffer harm and potential investors in

the Fund have continued to be misled because of the Fund's artificially depressed share value under the SEC's mandated full liquidation value method.

61.    Copley Fund first sought relief from the SEC in a letter, dated November 19, 2008, which included a 14-page memorandum summarizing Copley Fund's arguments rejecting the mandated use of the full liquidation method of accounting for deferred tax liability. *See* **Ex. D**.  After the SEC failed to respond to that letter for eight months, Copley Fund sent another letter on October 5, 2009, inquiring into the status of its request.  *See* **Ex. E**.  The SEC did not respond until December 2, 2009, when the DIM issued a perfunctory letter that merely restated the SEC's interpretation of the rules from which Copley Fund seeks relief.  *See* **Ex. F**. In sum, it took Copley Fund over a year to receive a communication from the SEC that merely returned Copley Fund to "square one": a situation in which the Fund's shareholders and potential investors are being harmed without any substantive, reasoned response to Copley Fund's arguments.

62.    Copley Fund tried again to obtain relief and due process from the SEC in a letter, dated September 28, 2011, in which Copley Fund requested assurance from the SEC that it would not take action against the Fund (*i.e.*, no-action relief) if it reverted to its prior method of accounting for deferred tax liability.  *See* **Ex. J**.  This letter went unanswered for six months.

63.    Copley Fund was compelled to send yet another letter to the SEC to obtain some response from the Commission.  In addition to laying out its various arguments against the mandated full liquidation value method and in favor of reversion to its prior and preferred method of accounting for deferred tax liability, this time, in a letter, dated March 12, 2012, Copley Fund specifically requested some written opinion from the SEC addressing its request for no-action relief so that it might seek judicial review in case of an adverse ruling.  *See* **Ex. K**.

This time, the SEC did not respond for over a year.  When it did respond on April 5, 2013, the

SEC, through the DIM, again failed to address Copley Fund's arguments and merely recited

general rules and accounting principles of general application.  *See* **Ex. L**.

64.     Undeterred, Copley Fund next sought *de novo* review from the full panel of

Commissioners and the issuance of a final written order on these issues in a letter dated April 12,

2013.  *See* **Ex. K**.  This time, the DIM unilaterally intercepted Copley Fund's letter directed to

the Commissioners.  *See* **Ex. N** (DIM letter dated June 18, 2013).  In a letter, dated July 15,

2013, Copley Fund objected to the DIM's intervention and again demanded that the DIM step

aside and permit the Fund to obtain review by the Commissioners and their issuance of a written,

final order.  *See* **Ex. O**.  In a letter, dated August 2, 2013, the DIM refused to permit Copley

Fund to petition the Commissioners and, instead, recommended that Copley Fund pursue

exemptive relief under Section 36 of the Exchange Act "[t]o the extent [it] seek[s] Commission

consideration of [its] request."  *See* **Ex. P**.

65.     In a final effort to obtain review by the full Commission, Copley Fund filed its

Application for exemptive relief with the SEC on September 4, 2013.  *See* **Ex. Q**.  After four

months of delay and inaction on its Application, Copley Fund sent another letter requesting

action by the Commission on these issues by February 28, 2014 at the latest.  *See* **Ex. R**.  This

last request, like many of the Fund's prior requests, has been met with silence from the SEC, thus

leaving Copley Fund without any administrative remedy after having exhausted all available

channels for administrative review.

66.     The SEC has acted arbitrarily and capriciously and has otherwise abused its

discretion in its treatment of Copley Fund's numerous requests for relief and a final, written

order.

## II.     THE SEC IS ARITRARILY AND CAPRICIOUSLY TREATING COPLEY FUND DIFFERENTLY THAN OTHER COMPANIES WITHOUT EXPLANATION

67.     With respect to Copley Fund, the SEC, through the DIM, has adopted the position that Rule 4-01(a)(1) of Regulation S-X and the accounting principles of general application referenced therein do not allow for *any* discretion or flexibility with respect to accounting for deferred tax liability.  *See* **Ex. L** at 2.

68.     This position is without basis in fact, however, as the SEC has permitted and exercised discretion and flexibility to depart from a strict interpretation of GAAP, or other tax accounting provisions, when doing so was appropriate and would lead to more accurate reporting.

69.     *Firstly*, several entities, including Weyerhaeuser, American Tower Corp., Cyrus One, Penn National Gaming, Empire State Realty, CoreSight, and Ryman Hospitality, converted from C Corporations into real estate investment trusts ("REITs") and, in doing so, have exercised discretion with respect to accounting for deferred tax liabilities.  Upon conversion to REIT status, those entities would be subject to a tax on any "built-in gains" that had accrued as of the conversion date, if they recognized gains on the disposition of any assets owned at the time of the conversion during the 10-year period following the conversion.  Nevertheless, none of these entities has accounted for deferred tax liabilities associated with such "built-in gains" – presumably concluding that their likelihood of disposing of such assets within the 10-year recognition period is exceedingly remote.  *See* **Ex. J** at 7-8 (discussion of Weyerhaeuser in Copley Fund's September 28 letter to the DIM).

70.     Upon information and belief, the SEC has not challenged the approaches of these entities.

21

71.     Notably, these REIT conversions all took place after 2010 – years *after* the SEC

mandated that Copley Fund *not* exercise similar management discretion with respect to its

deferred tax liability accounting.

72.     Although the Fund's situation is not entirely equivalent to that of Weyerhaeuser,

American Tower, and the other REIT-converted entities, it is sufficiently analogous because, like

those entities, Copley Fund is seeking to exercise discretion not to account for the full amount of

liabilities that are contingent and remote.

73.     There is no reasonable justification for the SEC to prohibit Copley Fund from

exercising similar management discretion, but later permitting Weyerhaeuser, American Tower,

and others to do so.  Put differently, Copley Fund submits that the SEC's interpretation of the

requirements of Rule4-01(a)(1) of Regulation S-X and accompanying accounting rules

of general application as applied to the Fund is arbitrary and capricious, as it is fundamentally

inconsistent with the deferred tax liability accounting of these REITs.

74.     *Secondly*, in at least one instance, the SEC has granted no-action relief permitting

an investment company to present its financial statements in a manner that would have been

prohibited under a strict, inflexible interpretation of GAAP.  In April of 2008, the DIM assured

Fidelity Investments that it would not recommend enforcement action against a Fidelity

registered investment company called the Gold Portfolio if it consolidated its financial

statements with those of its subsidiary, Fidelity Select Gold Cayman Ltd.  *See* Response of the

Office of Chief Accountant of the Division of Investment Management to Fidelity Investments,

2008 SEC No-Act. LEXIS 459 (Apr. 29, 2008).

75.     Under a technical reading of the ICA, the subsidiary might not have been

considered an investment company because it was only invested in commodities, which are not

considered "securities." *Id*. at *10.  Therefore, the Gold Portfolio technically was not permitted to consolidate its financial statements with the subsidiary, pursuant to GAAP and Rule 6-03(c)(1) of Regulation S-X, which preclude consolidation by a registered investment company with an entity that is not an investment company.  *Id*. at *4-*5.

76.     The DIM, however, accepted Fidelity's argument that notwithstanding those regulations, it would be appropriate to consolidate the financial statements of the subsidiary into the Gold Portfolio because it would give shareholders a "more accurate picture" of the portfolio and its structure.  Specifically, the subsidiary was authorized to invest in securities, would operate as an investment company for all relevant purposes, and was established to act as an investment vehicle for the Gold Portfolio.  *Id*. at *5, *15.

77.     Copley Fund, likewise, should be permitted flexibility to depart from a strict interpretation of GAAP by formulating a reserve for deferred tax liability which leads to a per-share NAV that better, and more accurately, reflects the true value of the Fund's shares to the investing public.

78.     The foregoing facts illustrate that the SEC has taken a flexible view of accounting principles and permitted management discretion in the past when appropriate in the circumstances and when investors are adequately protected.  The SEC's absolute and inexplicable inflexibility with respect to Copley Fund is arbitrary and capricious.

III.    THE SEC'S MANDATE THAT COPLEY FUND FOLLOW THE FULL
        LIQUIDATION METHOD IS ARBITRARY AND CAPRICIOUS BECAUSE
        THAT METHOD MISLEADS AND HARMS INVESTORS IN COPLEY FUND'S
        CASE

79.     The SEC's unexplained insistence that Copley Fund, which the SEC admits is unique, must account for deferred tax liability under the full liquidation value method is arbitrary and capricious because that method harms and misleads investors in Copley Fund's case.

80.     Beginning in 1992, Copley Fund implemented a policy of regularly monitoring the Fund's potential income tax liability on unrealized gains and accruing a reserve that corresponded with the anticipated actual liability.

81.     The estimate of the Fund's future liability was based on factors that included anticipated redemptions beyond the ability of the Fund to cover, the Fund's investment strategy and track record of holding dividend paying stocks for the long term, and the fact that the entire deferred liability would be due only in the unlikely event the entire portfolio were liquidated in one day.  (*See* November 2008 Memo, at **Ex. D**, for a more detailed explanation of the reserve methodology.)  ***During the entire period in which the Board employed this methodology, the reserve was never used***.  *See* **Ex. D** at 5.

82.     The Fund's use of the mandated full liquidation value methodology, under which it records the entire deferred tax liability, has led to a materially misleading reported NAV since 2007.

83.     Firstly, it does not accurately reflect Copley Fund's decades-long investment policy and practice.  Copley Fund's investment policy and practice includes long-term holding of its investment positions.  Its federal income tax liability from inception, expressed as a percentage of earnings is as follows:

| Year Ended | Tax reserve as % of total assets using SEC mandated tax reserve | Tax reserve as % of total assets using management determined tax reserve |
|---|---|---|
| 2/28/2013 | 23.97% | 1.17% (Assuming a management determined tax reserve of $1M) |
| 2/29/2012 | 21.43% | 1.21% (Assuming a management determined tax reserve of $1M) |
| 2/28/2011 | 20.25% | 1.26% (Assuming a management determined tax reserve of $1M) |
| 2/28/2010 | 18.11% | 1.45% (Assuming a management determined tax reserve of $1M) |
| 2/28/2009 | 15.67% | 1.56% (Assuming a management |

| | | determined tax reserve of $1M) |
|---|---|---|
| 2/29/2008 | 20.13% | 1.15% (Assuming a management determined tax reserve of $1M) |
| 2/28/2007 | 20.75% | 0.92% |
| 2/28/2006 | 19.31% | 1.00% |
| 2/28/2005 | 18.48% | 1.04% |

84.     The effect on the price at which Copley Fund may issue and redeem shares is as

follows:

| Year Ended | Share Price NAV – Tax reserve @ 35% | Share Price NAV – Management Determined tax reserve |
|---|---|---|
| 2/28/2013 | $56.17 | $73.07 |
| 2/29/2012 | $49.89 | $62.76 |
| 2/28/2011 | $46.27 | $57.31 |
| 2/28/2010 | $40.21 | $48.39 |
| 2/28/2009 | $35.80 | $41.81 |
| 2/29/2008 | $44.07 | $54.56 |
| 2/28/2007 | $43.71 | $54.67 |
| 2/28/2006 | $38.17 | $46.86 |
| 2/28/2005 | $36.12 | $43.88 |

85.     Secondly, calculating NAV under the SEC's mandated full liquidation value

method materially understates the amounts of assets actually under management, and thereby

overstates investment results as a percentage of assets in both good years and bad.  The

following chart indicates the misleading results:

| Year Ended | Unrealized Gain/Loss | Investment results using SEC tax reserve | Investment results with management determined tax reserve |
|---|---|---|---|
| 2/28/2013 | $7,592,996 | 7.46% | 8.97% |
| 2/29/2012 | $4,822.356 | 11.67% | 5.93% |
| 2/28/2011 | $8,364,758 | 13.26% | 10.71% |
| 2/28/2010 | $6,583,992 | 11.71% | 9.73% |
| 2/28/2009 | ($12,450,117) | -22.14% | -19.83% |
| 2/29/2008 | $2,418,380 | 3.48% | 2.81% |
| 2/28/2007 | $12,198,111 | 17.57% | 14.04% |
| 2/28/2006 | $4,815,279 | 7.92% | 6.45% |
| 2/28/2005 | $7,715,251 | 13.00% | 10.70% |

86.     Thirdly, calculating NAV under the SEC's mandated full liquidation value method materially overstates Copley Fund's operating expense ratio.  As of February 28, 2013, the Fund's ratio of total annual operating expenses to average net assets, using the SEC's full liquidation method, was 6.14%.  Without including these deferred taxes, which are not an actual operating expense of the Fund, but including a management determined reserve, the ratio would be 1.68%, which is more appropriate for comparison to other funds.  The following chart compares the Fund's expense ratio under the full liquidation method and the reserve method used by Copley Fund before 2007:

| Year Ended | Expense ratio using SEC tax reserve | Expense ratio using management determined tax reserve |
|---|---|---|
| 2/28/2013 | 6.14% | 1.68% |
| 2/29/2012 | 4.51% | 1.97% |
| 2/28/2011 | 7.96% | 1.95% |
| 2/28/2010 | 5.54% | 1.70% |
| 2/28/2009 | 1.58% | 1.35% |
| 2/29/2008 | 1.56% | 1.25% |
| 2/28/2007 | 5.90% | 1.13% |
| 2/28/2006 | 3.01% | 1.21% |
| 2/28/2005 | 3.82% | 1.15% |

87.     It is in the best interests of the Fund's shareholders to reserve for deferred tax liability in a manner that allows per share NAV to reflect accurately the true value of the Fund's shares and its performance.  As Copley Fund has always assured the SEC, if permitted to do so, it will provide full transparency to investors by, for example, including in its prospectus a clear explanation of the differing effects in pricing, as calculated using the reserve method and the full liquidation value methods.

IV.    THE SEC'S REFUSAL TO CONSIDER OR EVEN RESPOND TO THE MERITS
       OF COPLEY FUND'S PROPOSED RESERVE METHODS IS ARBITRARY AND
       CAPRICIOUS

    A.    Copley Fund's Proposed Methodologies For Accounting For Deferred Tax
             Liability On Unrealized Gains

88.    Copley Fund has presented to the SEC two alternatively defined formulas for

calculating the reserve and allowing pre-set means to sell securities in its portfolio to satisfy

extraordinary redemptions if necessary.  These proposals – which include (a) a pre-set reserve

formula, (b) investor disclosures comparing this method to the full liquidation value method,

and (c) Board preparations for RIC conversion (if necessary because of unforeseen events) – all

provide greater benefit to investors than the full liquidation value method Copley Fund is

currently required to follow.

89.    Copley Fund's proposed reserve methodologies are appropriate given the unique

status and history of the Fund and, in particular, given the treatment apparently afforded

to Weyerhaeuser, American Tower, and others, all of which have excluded deferred tax liabilities

relating to assets whose sale is considered remote.  The SEC has a regulatory obligation

to provide Copley Fund with equal treatment.  Its failure to do so and its unwillingness to even

issue a final order after many years of Copley Fund seeking administrative relief is both arbitrary

and capricious.

90.    Copley Fund proposes to accrue a deferred tax liability that fairly and accurately

reflects a realistic tax liability, and which addresses the issues regarding the ability to meet

redemptions at a NAV that does not include a tax reserve that assumes full liquidation.

Specifically, the Fund proposes to accrue a defined tax liability using one of the following two

formulas, each of which is fully transparent.  Either alternative will assure investors in the Fund

the ability to redeem their shares at the stated, accurate NAV, thus addressing any concerns that the Commission may have previously harbored.

    i.  Alternative 1

91.  At the end of each calendar quarter, Copley Fund will calculate its average historical turnover rate over the previous five, or even ten, years.  In calculating its NAV on a daily basis, Copley Fund will use a tax reserve calculated at a tax rate equal to a percentage of the statutory corporate tax rate determined at four times the average historical turnover rate.

92.  The historic, average five-year turnover rate of the Fund for the period from February 29, 2008 through February 28, 2013, was 1.62%; the average ten-year turnover rate is 1.48%.[4]

93.  Thus, for example, if the unrealized gain at the close of business is $50,000,000, the deferred tax liability under the full liquidation value approach would be $17,500,000.  Under either the historical, five-year rate of 1.62% or the historical ten-year rate of 1.48% (both rounded to 1.7%), Copley Fund would set a reserve at four times that 1.7%, or 7%, of the $17,500,000, *i.e.*, $1,225,000.  Based on these actual average historical rates, any multiple of four times allows for a reasonable and adequate tax reserve.

94.  This formula obviously would be independent of any unfettered discretion of the Fund's management.  Rather, it would reflect, in a most conservative manner, the average historical turnover rate of the Fund and, therefore, the lack of need for – or propriety of – a "full" or "liquidation based" tax reserve.

95.  Under this scenario, the Fund would ensure that even if it receives requests on any given day which would require sales of investment assets at a rate *four times* in excess of its

---

[4] Copley Fund's turnover rate for the one-year period ending February 29, 2012 was 0.0%.

historical rates – a high number based on a 20-year historical track record – it will be able to accommodate such requests.

           ii.     Alternative 2

96.     At the end of each trading day, the Fund will determine the highest daily redemption of its shares (as a percentage of shares outstanding) during the previous five years. In calculating its NAV on a daily basis, Copley Fund will use a tax reserve calculated at a tax rate equal to a percentage of the statutory corporate tax rate determined at four times the highest daily redemptive rate.

97.     For example, if the unrealized gain at the close of business is $50,000,000, the deferred tax liability under the full liquidation value approach would be $17,500,000.  If the historically highest daily redemptive rate of the Fund were 2%, Copley Fund would set a reserve at four times that 2%, or 8%, of the $17,500,000, *i.e.*, $1,400,000.

98.     This formula, likewise, would be totally independent of the unfettered discretion of the Fund's management.  It would reflect, in a most conservative manner, the historically low redemptive rate of the Fund and, therefore, the lack of need for – or propriety of – a "full" or "liquidation based" tax reserve.

99.     Under this scenario as well, the Fund would insure that even if it receives redemption requests on any given day that are *four times* greater than its historically highest redemption – an inconceivably high number based on a 20-year historical track record – it will be able to accommodate such redemptions.

100.     Under either reserve methodology, to provide full disclosure and protection to investors, Copley Fund would present in its public disclosures appropriate charts that compare

the Fund's NAV under management's reserve methodology to the full liquidation value method

under accounting principles of general application and appropriate text to explain the differences.

B.    Copley Fund's Proposed Reserve Methodologies Are Consistent With
Generally Accepted Accounting Principles

101.    The reserve methodologies Copley Fund proposes are more consistent with the

assumptions, constraints and conventions underlying GAAP than the currently mandated full

liquidation value methodology.

102.    For example, under GAAP, there is an assumption that a business will continue to

operate as a going concern. *See*, *e.g.*, Accounting Research Bulletin 43, Chapter 3: Working

Capital, Section A (stating "It should be emphasized that financial statements of a going concern

are prepared on the assumption that the company will continue in business."). The full

liquidation value method, by contrast, assumes the Fund will immediately close, be sold

or entirely liquidated *en masse*.

103.    Further, the use of the full liquidation value method is contrary to the principle

of adequate disclosure underlying GAAP, in that it presents financial statements that are

effectively misleading because they do not accurately convey the true value of Copley Fund's

shares, its operating expense ratio or its performance. *See* **Ex. D** at 10 (Copley Fund's

November 19, 2008 letter to the DIM in which these accounting policy arguments are explained

in greater detail).

104.    Even assuming, *arguendo*, the Fund's proposed reserve methodologies would

depart from the accounting provision of general application on which the SEC relies, ASC 740,

GAAP does allow for certain flexibility when, for instance, the strict adherence to GAAP

appears unreasonable under the circumstances and/or would produce unjustifiable results. The

SEC has appropriately recognized this concept. *See* **Ex. D** at 11 n.5 (citing the SEC's issuance

of rules even for the use of non-GAAP financials, Release No. 33-8176, 34-17226 (January 22,

2003)).  Indeed, in December 2008, the Commission submitted to Congress a report on mark to

market accounting in which it presented recommendations that suggested the appropriateness of

discretion and flexibility, including the application of "judgment" in making market price

decisions.  *See* **Ex. E** at 2.

105.    Here, the use of the full liquidation value method has produced a skewed and

unreasonable result – Copley Fund's per share NAV does not reflect the realistic value of the

Fund, its operating expenses or its performance – and, therefore, such flexibility is warranted.

C.      Copley Fund's Proposed Reserve Methodologies Are Consistent With
        Investment Company Act Rules

106.    Rule 22c-1 of the ICA requires open-end funds to issue and redeem shares "at a

price based on the current net asset value of such security…."  In turn, the rules define "current

net asset value" as the "amount which reflects calculations, whether or not recorded in the books

of account, made substantially in accordance with the following, *with estimates used where*

*necessary or appropriate*."  ICA Rule 2a-4 (emphasis added).

107.    Rule 2a-4(a)4 of the ICA provides that in calculating "current net asset value" for

use in computing the current price of redeemable securities: "*Appropriate provision* shall be

made for federal income taxes if required."  (emphasis added).  Rule 2a-4(a)(4) does not define

"if required."

108.    The above two ICA Rules, read together, do not explicitly require sales or

redemptions *at* "net asset value."  ICA Rule 22c-1(a) requires sales or redemptions to be at a

price *based on* current net asset value.  Rule 2a-4(a)(4) provides for how to calculate net asset

value for use "in computing periodically the current price for the purpose of" sales and

redemptions.  Using "net asset value" to compute a price based on net asset value is not the same as requiring net asset value to be the price.

109.    There is no explicit requirement in the above two ICA Rules to use GAAP, but the Commission has required GAAP in financial statement reporting by registered investment companies.  But in the case of Copley Fund, simple and mechanical application of GAAP creates misleading financial reporting, as explained above.  Therefore, Copley Fund should be permitted to prepare its financial reports based on a net asset value calculation that reflects a management determined tax reserve, so long as there is transparency in explanation as to how the tax reserve and the share price is determined.

D.    Copley Fund Is Willing And Able To Convert To A RIC If Necessary

110.    Copley Fund has repeatedly assured the SEC of its willingness to convert to RIC status in the highly unlikely event unforeseen circumstances caused gains to be realized that consumed the entire amount of accumulated deferred income taxes it has recognized.  *See* **Ex. D** at 6-8.  Indeed, the Fund enacted Board resolutions on March 23, 2012 confirming its intent and detailing how and when this RIC conversion shall occur.  The Fund could elect RIC status simply by filing a RIC tax return for the year in which the status is deemed to be effective.  Any capital gains taxes due and payable at the end of the tax year, which in theory would be greater than the reserve, would then be shifted to the individual shareholders.  Such a distribution would, however, effectively end the Fund's unique ability to defer tax consequences for its shareholders.

111.    Since inception, management of the Fund has not elected RIC status but rather has opted to be treated as a C Corporation.  Underlying this decision is the fact that the dividends received deduction is available to a C Corporation but not available to a RIC.  This concept is critical to the Fund's basic investment strategy to create and accumulate dividend income for the

Fund using the 70% deduction from federal income taxes for dividends received.  Thus,

the Fund's regular income tax liability is kept to a minimum and shareholders are allowed to

defer taxes until redemption.

112.    Hence, conversion to a RIC is a viable alternative to the Fund but is contrary

to the Fund's stated investment objective and strategy.  Therefore, it is not something that would

be undertaken unless the conditions precedent to making the election, materially exceeding the

reserve for deferred tax liability on unrealized gains, have been met.

113.    These conditions precedent have never been met.  Even before the SEC demanded

Copley Fund allocate reserves pursuant to the full liquidation method in 2007, the reserve

established by Copley Fund's management was never exceeded.

<u>COUNT I</u>

ARBITRARY AND CAPRICIOUS AGENCY ACTION IN DENYING COPLEY FUND'S
APPLICATION FOR EXEMPTIVE RELIEF UNDER SECTION 36 OF THE
<u>SECURITIES EXCHANGE ACT OF 1934</u>

114.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs

from 1 through 113.

115.    Pursuant to Section 36 of the Exchange Act, the Commission "may conditionally

or unconditionally exempt" Copley Fund from rules "to the extent that such exemption is

necessary or appropriate in the public interest, and is consistent with the protection of investors."

15 U.S.C. § 78 mm.

116.    For literally years, Copley Fund has sought review by the SEC of its numerous

arguments in favor of relieving the Copley Fund from the rote and inflexible application of

Rule 22c-1, promulgated under the ICA, and Rule 4-01(a)(1) of Regulation S-X, which,

according to the SEC's interpretation, requires Copley Fund to account for deferred tax liability using the full liquidation value method.

117.    After years of receiving no substantive response to its arguments from the DIM, and after the DIM intercepted and thwarted Copley Fund's efforts to obtain review of its requests by the full panel of Commissioners, Copley Fund – at the DIM's suggestion – filed an application for exemptive relief from the above-referenced rules directly with the Commissioners.

118.    In its Application, Copley Fund presented the same arguments it had put before the SEC as early as 2008, namely, that the SEC's demand that it set a tax reserve for unrealized gains on the assumption of full liquidation is (a) misleading to investors because it substantially understates the Fund's invested assets and NAV, while overstating its operating expenses; (b) inconsistent with Copley Fund's uninterrupted history and investment philosophy of reinvesting dividends and accumulating capital gains; (c) incompatible with Copley Fund's unique structure; and (d) inconsistent with the SEC's treatment of similarly situated investment companies, such as Weyerhaeuser, American Tower Corp., and others.

119.    Copley Fund further set forth in detail proposals that would benefit current and future investors, which included (a) a pre-set reserve formula based on Copley Fund's historic performance and practices, (b) investor disclosures comparing this method to the full liquidation value method, and (c) Board preparations for RIC conversion if necessary because of unforeseen events.

120.    This effort, too, proved futile, as the Commissioners failed to issue any response to Copley Fund's Application for exemptive relief, despite Copley Fund's repeated request that

the Commissioners issue some substantive response to the arguments presented in its

Application.

121.    The record to date must be taken as the Commission's final, legal position that,

under the relevant laws and regulations, Copley Fund must account for NAV under the full

liquidation method or risk enforcement action, and constitutes final agency action under

5 U.S.C. § 704.

122.    The Commission's effective denial of Copley Fund's Application for exemptive

relief and failure to address any of the Fund's meritorious arguments in favor of altering its

method of accounting for deferred tax liability, all of which have been before the Commission

*for more than five years*, have been arbitrary, capricious, an abuse of discretion, and unlawful.

123.    Copley Fund is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

COUNT II

DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201 *ET SEQ.*

124.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs

from 1 through 123.

125.    For the reasons set forth in the preceding paragraphs, this Court has jurisdiction

over this matter and there is a justifiable, ripe controversy among the parties sufficient for the

Court to issue a declaration of their rights and other legal relations under 28 U.S.C. § 2201

*et seq.*

126.    For the reasons set forth in the preceding paragraphs, absent declaratory relief,

Copley Fund will continue to suffer harm.

127.    Copley Fund seeks judicial declarations that:

a.      Copley Fund's proposed methodologies for accounting for deferred tax liability on unrealized gains and accompanying measures as set forth in paragraphs 88 through 100 above are in the public interest and consistent with the protection of investors;

b.      Requiring Copley Fund to use the full liquidation value method to account for deferred tax liability, as the SEC has mandated since 2008 according to its interpretation of Rule 22c-1, promulgated under the ICA, Rule 4-01(a)(1) of Regulation S-X, and accounting principles of general application referenced therein, harms Copley Fund's shareholders and misleads investors;

c.      Copley Fund need not comply with the SEC's interpretation of Rule 22c-1, promulgated under the ICA, Rule 4-01(a)(1) of Regulation S-X, and accounting principles of general application referenced therein, so long as it accounts for deferred tax liability on unrealized gains pursuant to one of the methods identified in paragraphs 88 through 100 in this Complaint;

d.      The Commission's denial of exemptive relief under Section 36 of the Exchange Act was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A); and

e.      Copley Fund is otherwise exempt from Rule 22c-1, promulgated under the ICA, Rule 4-01(a)(1) of Regulation S-X, and accounting principles of general application referenced therein, so long as it accounts for deferred tax liability on unrealized gains pursuant to one of the methods identified in paragraphs 88 through 100 in this Complaint.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Copley Fund requests *de novo* review of its Application and an order and judgment declaring the parties' rights and legal relations as set forth in Counts I and II above and enjoining the Commission and its officers, employees, and agents from taking enforcement

action against Copley Fund for acting in accordance with the Court's order and declarations;

and granting such other and further relief as this Court deems just and proper.

Dated: March 19, 2014

Respectfully submitted,
**BLANK ROME LLP**


/s/ PAUL M. HONIGBERG
Paul M. Honigberg
D.C. Bar No. 342576
honigberg@blankrome.com
600 New Hampshire Avenue NW
Washington, DC 20037
Tel: (202) 772-5955
Fax: (202) 572-8374

Philippe M. Salomon (*to be admitted p.h.v.*)
psalomon@blankrome.com
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-0208
Tel: (212) 885-5455
Fax: (917) 332-3792

Jason A. Snyderman (*to be admitted p.h.v.*)
snyderman@blankrome.com
William R. Cruse (*to be admitted p.h.v.*)
cruse@blankrome.com
130 North 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5500
Fax: (215) 832-5500

*Counsel for Copley Fund, Inc.*